UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PHILLIP S. WOODRUFF,  :
:
Plaintiff,  :
: Civil Action No.:  01-1964 (RMU)
v.  :
: Document No.:  37
NORMAN Y. MINETA, Secretary,  :
U.S. Department of Transportation,  :
:
Defendant.  :

### MEMORANDUM OPINION

GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This employment-discrimination case comes before the court on the defendant's motion for summary judgment.  The plaintiff, Phillip S. Woodruff, brings suit against the Federal Aviation Administration ("the defendant" or "FAA"), claiming that the FAA discriminated against him based on his age, gender, race, disability, and in retaliation for protected activity. The FAA now moves for summary judgment, claiming that the plaintiff failed to exhaust administrative remedies and that the plaintiff fails to establish a case of retaliation.  Because the plaintiff failed to exhaust administrative remedies, and because the plaintiff cannot establish a case of retaliation, the court grants the defendant's motion for summary judgment.

## II. BACKGROUND

### A. Factual Background

The FAA hired the plaintiff in August 1986. 2d. Am. Compl. ("Compl.") ¶ 6. In April 1996, Mr. Carson Eoyang became the Program Director for Training in the Office of Training for the Assistant Administrator of Human Resource Management at the FAA. Def.'s Statement ¶ 5. When Eoyang became Program Director, he centralized all financial, budgetary, and contractual authority from all subordinates under his direct control, including the plaintiff. Def.'s Statement ¶ 8; Pl.'s Statement ¶ 6.[1]

On or about September 29, 1995, the plaintiff suffered a workplace injury. Compl. ¶ 8. In May 1997, the plaintiff had surgery relating to the injury. Def.'s Statement ¶ 9. He stayed on medical leave and collected worker's compensation through January 31, 1998. *Id.* ¶ 11. While the plaintiff was on medical leave, Eoyang assumed certain of the plaintiff's supervisory responsibilities. *Id.* ¶ 12.[2] When the plaintiff returned from medical leave in February 1998, he requested that he be able to resume the supervisory functions of his job. *Id.* ¶ 14. In a memorandum dated April 30, 1998, Eoyang advised the plaintiff that he would not grant the plaintiff's request to resume supervisory functions. *Id.* Eoyang explained to the plaintiff that because the plaintiff had not yet resumed a regular, full-time schedule, the plaintiff would be

---

[1] The plaintiff disputes that Eoyang had authority to remove the plaintiff's financial, budgetary, and contractual authority, but the plaintiff does not dispute that such Eoyang removed such authority. Pl.'s Statement ¶ 6.

[2] Although the plaintiff disputes that Eoyang needed to assume the plaintiff's supervisory responsibilities, the plaintiff does not appear to dispute that Eoyang did in fact assume those responsibilities. *Id.* ¶ 8.

unable to supervise appropriately.  *Id.* ¶ 15.[3]

### B.  Procedural History

In February 1997, the plaintiff filed an EEOC charge against Eoyang and two other management officials (Kay Dolan and Edwin Verburg), alleging an attempt to withdraw and revoke his authority as a senior manager.  Compl. ¶ 10; Opp'n Ex 46.  The plaintiff requested a hearing for the charge in April 1998 and deposed certain FAA officials (including Eoyang) in connection with the charge in August and September 1998.  Opp'n Exs. 13, 15, 20, 49.  The plaintiff ultimately withdrew the charge.  *Id.* Ex 52.

The plaintiff next contacted an EEOC counselor on August 11, 1998 with various claims regarding Eoyang's decision not to return supervisory responsibilities to the plaintiff and non-accommodation of the plaintiff's disabilities.  Def.'s Statement ¶ 19; Def.'s Ex. 9.  The plaintiff filed an EEOC charge regarding Eoyang on December 1, 1998.  *Id.* ¶¶ 19-20.  On September 14, 2001, following an unsuccessful attempt at mediation, the plaintiff brought the instant suit against the defendant.  After the plaintiff brought suit, he again experienced what he believed to be discrimination and retaliation based on race, gender, age, disability, and his prior EEOC charge.  Compl. ¶ 14.  Thus, in 2001, the plaintiff filed his third EEOC charge, this time alleging retaliation for his prior protected activity.  *Id.* ¶ 15.

On January 29, 2002, the defendant moved this court to dismiss the plaintiff's complaint for failure to state a claim, arguing that the plaintiff became aware of Eoyang's alleged discrimination no later than April 30, 1998 and that the plaintiff failed to contact an EEOC

---

[3]  The plaintiff maintains that he had in fact "resumed a regular schedule and had provided information [regarding his schedule] to Mr. Eoyang."  *Id.* ¶ 12.

counselor within forty-five days of that date. On August 7, 2002, this court granted in part and denied in part the defendant's motion to dismiss. The court noted that a forty-five day filing requirement, calculated from April 30, 1998, would make June 15, 1998 the final day the plaintiff could have initiated a charge with the agency. However, the court noted that the plaintiff stated that the defendant discriminated against him on July 10, 1998 and that the plaintiff took the position that he would not challenge any actions the defendant may have taken against him in April 1998. Accepting the plaintiff's well-pled factual allegations as true for the purposes of a motion to dismiss, the court denied the defendant's motion but clarified that only claims about the defendant's actions in July 1998 could proceed.[4] In the same opinion, the court granted the defendant's motion for a more definite statement and instructed the plaintiff to file an amended complaint. On September 2002, the plaintiff filed an amended complaint, and in April 2004, the court granted the plaintiff's motion to file a second amended complaint.

### III. ANALYSIS

#### A. Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are

---

[4] The defendant also sought dismissal on the basis that the plaintiff did not raise his claims in his administrative complaint. The court rejected that argument.

"material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C.

Cir. 1998) (en banc); *see also Johnson v. Digital Equip. Corp.*, 836 F. Supp. 14, 18 (D.D.C. 1993).

### B. Exhaustion

The defendant seeks dismissal of the entire complaint on the grounds that the plaintiff failed to exhaust his administrative remedies by not seeking counseling before July 1998. Def.'s Mot. at 4. The defendant states that the plaintiff knew that Eoyang "had decided to continue performing certain supervisory responsibilities in early 1998, and certainly by April 30, 1998." *Id.* at 5. Thus the defendant argues that, because the forty-five day period for contacting an EEOC counselor begins to run when a plaintiff believes he was subject to discrimination, the plaintiff's eventual contact with an EEOC counselor in August 1998 fell outside the forty-five day window.[5] The plaintiff responds with what would appear to be a continuing violations theory. Opp'n at 8. Specifically, the plaintiff states that he

> has alleged a series of related events culminating in adverse action taken by Plaintiff's supervisor Carson Eoyang on or about July 10, 1998 . . . While some of the events complained of did indeed occur prior to that time, a continuing series of events occurred after [] July 10 as well . . . Each of these events is related to the erosion of Plaintiff's managerial authority and is therefore related to Plaintiff's claim for discrimination and retaliation.

*Id.*

Title 29 C.F.R. § 1614.05(a) requires that a federal employee who believes that he has been discriminated against on the basis of race, color, religion, sex, national origin, age, or handicap contact an EEOC counselor within forty-five days of the discriminatory act or the

---

[5] As indicated above, it is undisputed that the plaintiff did not contact an EEOC counselor by June 15, 1998, or within forty-five days of his receipt of the April 30, 1998 memorandum from Eoyang. Def.'s Statement ¶ 18. The plaintiff states only that he contacted an EEOC counselor within forty-five days of a July 10, 1998 action in which Eoyang removed "certain aviation education programs" from the plaintiff's duties. Pl.'s Statement ¶ 19.

effective date of the personnel action.[6] If the employee fails to do so, his claim is barred. 29 C.F.R. § 1614.05(a). As the plaintiff's submissions make clear, the plaintiff became aware of his loss of certain duties and responsibilities in February 1998,[7] when the plaintiff returned to work following his medical leave. Pl.'s Statement ¶¶ 10-11. The plaintiff therefore had to seek EEOC counseling by mid-March 1998. Title 29 C.F.R. § 1614.05(a); *see also id.* § 1614.05(a)(2) (providing that the forty-five-day period can be extended when the complainant did not know or reasonably should not have known that a discriminatory act occurred). The plaintiff sought EEOC counseling in August 1998, however, well after the forty-five day window. The plaintiff thus failed to exhaust his administrative remedies for his claims based on race, gender, age, and disability, and the court dismisses those claims.[8]

---

[6] Under the ADEA, a plaintiff may also bring an age-discrimination claim directly to federal court if he provides at least 30 days notice to the EEOC of his intent to sue before commencing the suit and he files this notice within 180 days from the date of the alleged discriminatory conduct. 29 U.S.C. § 633a(d); *Stevens v. Dep't of Treasury*, 500 U.S. 1, 5-6 (1991) (describing the two routes by which a federal employee may bring an ADEA claim to federal court).

[7] Or at the latest on April 30, 1998, when the plaintiff received a memo to the same effect. Def.'s Statement ¶¶ 14-15.

[8] As indicated above, the plaintiff attempts to avoid dismissal by arguing that his loss of certain duties and responsibilities in February 1998 was part of a "series of related events" or a "continuing discriminatory employment practice" that culminated with Eoyang notifying the plaintiff of removal of certain responsibilities on or about July 10, 1998. Opp'n at 8. A citation to *National R.R. Passenger Corp. v. Morgan*, is sufficient to dispose of that contention. 536 U.S. 101, 113 (2002) (stating that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). The court further notes on this point that it does not read the plaintiff's complaint to state a claim for hostile work environment. *See* Def.'s Reply at 1; *see also* Def.'s Mot. at 18.

## C. Retaliation

### 1. Legal Standard for Retaliation Claims Based on Indirect Evidence

Because the plaintiff need not exhaust his administrative remedies to file a claim of retaliation, the plaintiff's allegation of retaliation survives the above exhaustion analysis. *Baker v. Library of Congress*, 260 F. Supp. 2d 59, 66 n.4 (D.D.C. 2003) (citing cases). To prevail on a claim of retaliation in the absence of direct evidence of retaliation, a plaintiff must follow the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), three-part burden-shifting analysis, which the Supreme Court has explained as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802 (citations omitted)).

To state a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Carter v. George Washington University*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)).

If the plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee. *Burdine*, 450 U.S. at 254. To rebut this presumption, the employer must articulate a legitimate, non-discriminatory reason for its action.

8

*Id.* The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (internal citations omitted). At this point, to survive summary judgment, the plaintiff "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Id.* (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291.

### 2. The Plaintiff's Prima Facie Case of Retaliation

The defendant does not dispute that the plaintiff engaged in protected activity; rather, the defendant focuses on the second and third prongs of the prima facie case for retaliation. As to

9

adverse personnel action, the defendant argues that "[n]othing Plaintiff's supervisor did caused Plaintiff to suffer a decrease in compensation, or diminished opportunities for promotion." Def.'s Mot. at 14. Further, the defendant claims that "Plaintiff's grade, pay and benefits remained the same, despite his extensive absences from work, and he was told his supervisory responsibilities would be reconsidered when his schedule was no longer erratic." *Id.* The plaintiff responds that the court should focus not on economic compensation (which the plaintiff would appear to concede remained unchanged), but on the effects of diminution in authority and adverse consequences to career advancement. Opp'n at 10-11.

Although the plaintiff's complaint is not entirely clear, the plaintiff alleges retaliation that occurred in 1998 consisting of the (a) downgrading of his position "in an attempt to reduce [the plaintiff's pay] grade," (b) removing the plaintiff from the position of Aviation Education Functional Team Leader, (c) reassigning the plaintiff to a non-supervisory position, (d) revoking disability accommodations previously granted to the plaintiff, and (e) placing stress on the plaintiff. Compl. ¶ 12. Additionally, the plaintiff alleges retaliation in 2001 consisting of (a) transferring the administration and oversight of the Aviation Education Program from the plaintiff and (b) removing all managerial responsibility from the plaintiff. *Id.* ¶ 14. Because the plaintiff's opposition only focuses on retaliation in 1998, Opp'n at 11-13, the court limits its analysis accordingly. *See, e.g.*, *F.D.I.C. v. Bender*, 127 F.3d 58, 66-67 (D.C. Cir. 1997); *Nails v. England*, 311 F. Supp. 2d 116, 122 (D.D.C. 2004).

### a. Adverse Personnel Action

Although the plaintiff is correct to point out that not all adverse personnel actions need to have a direct economic impact, to establish an adverse personnel action in the absence of

diminution of pay or benefits, the plaintiff must show actions with "materially adverse consequences affecting the terms, conditions, or privileges of employment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002). Thus, the plaintiff's unelaborated assertion of workplace stress is not actionable as an adverse personnel action. *Id.* at 1136; *cf. Russ v. Van Scoyoc Associates, Inc.*, 122 F. Supp. 2d 29, 32 (D.D.C. 2000) (stating that "it is clear that merely being yelled at by your supervisor does not rise to the level of an adverse employment action").

As to the plaintiff's claims regarding re-assignment or diminishment of responsibilities, the D.C. Circuit has stated that:

> when an employer makes a hiring decision, "[s]hort of finding that the employer's stated reason was indeed a pretext . . . the court must respect the employer's unfettered discretion to choose among qualified candidates." The same standard holds true when an employer decides which of several qualified employees will work on a particular assignment. Perhaps in recognition of the judicial micromanagement of business practices that would result if we ruled otherwise, other circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour change.

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556-57 (D.C. Cir. 1997) (alterations in original; internal citation omitted). Thus, for a change in assignments or duties to constitute an adverse personnel action, the change must amount to "*significantly diminished* material responsibilities." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (emphasis in original) (citing *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). The changes "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at 136.

Furthermore, although courts have consistently held that mere dissatisfaction with a commute is not actionable as an adverse personnel action, *Burnette v. Northside Hosp.*, 2004 WL

2495895 (N.D. Ga. 2004) (citing cases), denial of a plaintiff's commuting accommodations when those accommodations may have been medically necessary could very well affect the terms, conditions, or privileges of employment, *cf. Grande v. State Farm Mut. Auto. Ins. Co.*, 83 F. Supp. 2d 559, 563 (E.D. Pa. 2000) (suggesting that a "lengthened commute" with "some evidence of actual harm to plaintiff's career or some indication that [the plaintiff] could not perform the job" could constitute an adverse personnel action).

The plaintiff's claims regarding loss of managerial authority, inability to return to the same level of authority and responsibility, and denied commuting arrangements (i.e., the alleged lack of "disability accommodations") are not a mere inconvenience or minor alteration of job responsibilities. *Crady*, 933 F.2d at 136 (noting that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"); Opp'n Ex. 22. Indeed, as indicated above, courts recognize that the significant diminution of material responsibilities can constitute an adverse personnel action, as can a change in commuting arrangements that prevents an employee from properly performing his employment obligations. *Kocsis*, 97 F.3d at 886; *Grande*, 83 F. Supp. 2d at 563. Accordingly, the court determines that the plaintiff states actionable adverse personnel actions for changes in his job responsibilities and commuting arrangements.

### b. Causal Connection

The plaintiff has more difficulty establishing a causal connection between any protected activity and the alleged retaliation. A plaintiff may establish a causal connection "by showing

that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). To establish a causal connection, however, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval cases holding that a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and that a twenty-month period suggests "no causality at all"). In this case, the plaintiff focuses on incidents following three protected activities: his February 1997 EEOC complaint, his request in April 1998 for an EEOC hearing, and his September 1998 deposition of Eoyang and Ms. Dolan. Opp'n at 12.

The plaintiff connects his first set of protected activities – his February 1997 EEOC complaint and interviews concerning that complaint several months later – with alleged retaliation occurring on his "return from detail in February 1998." Opp'n at 12. As the plaintiff acknowledges, however, his return occurred "approximately 9 months" after his latest protected activity. *Id.* The court holds that, as a matter of law, nine months is too much time between an adverse action and protected activity to establish causation. *Clark County Sch. Dist.*, 532 U.S. at 273.

Second, the plaintiff points to his request for an EEOC hearing "approximately one week before" Eoyang sent his April 1998 memorandum, which indicated that Eoyang would not return the plaintiff's supervisory duties. Opp'n at 12. The problem here, however, as the plaintiff has essentially acknowledged, is that nothing that Eoyang had to say in his April 1998 memorandum

13

was new or different than what the plaintiff was already aware of when he returned to work several months earlier. Nor does Eoyang's removal of "certain aviation education programs" from the plaintiff in July 1998 establish a sufficient causal connection. *Clark County Sch. Dist.*, 532 U.S. at 273.

Finally, the plaintiff claims that he deposed Eoyang and Dolan "just prior to the September 10, 1998 refusal to return his supervisory duties and honor his telecommuting and maxi-flex schedule agreements." Opp'n at 12-13. Although the plaintiff does not cite to the record, it would appear that the plaintiff refers at least in part to a September 3, 1998 memorandum from Eoyang to the plaintiff in which Eoyang informs the plaintiff that Eoyang is concerned about the "irregularity" of the plaintiff's work schedule. Opp'n Ex. 10. Eoyang goes on to say in this memorandum that the plaintiff must send Eoyang by no later than September 11, 1998 information on the specific "accommodations and flexibilities" that the plaintiff would need to continue his work schedule. *Id.* Eoyang also indicated that although the plaintiff had "updated" his telecommuting agreement from 1995, Eoyang had not yet seen or approved that agreement and that, therefore, the plaintiff would need to seek approval for future telecommuting. *Id.*

It appears (although again the plaintiff does not direct the court to a specific exhibit) that Eoyang received certain information from the plaintiff by that deadline and determined, at least in the plaintiff's words, that Eoyang would no longer "honor the accommodations" that the plaintiff had previously received. Opp'n Ex. 34. Despite the plaintiff's less than lucid opposition and lack of citation to pertinent exhibits, the court determines that there is sufficient temporal proximity between the depositions and Eoyang's refusal to honor the plaintiff's

14

telecommuting and maxi-flex schedule agreement to establish a causal connection. As to the alleged refusal to return supervisory duties in September 1998, the plaintiff fails to supply the court with any indication as to how this refusal differs, if at all, from the earlier refusals. But even assuming *arguendo* that the plaintiff establishes a causal connection with this claim, for the reasons that follow the plaintiff cannot survive summary judgment.

### 3. The Defendant's Nondiscriminatory Explanation

The defendant argues that even if the plaintiff establishes a prima facie case, the defendant has sufficient legitimate reasons for its conduct. Def.'s Mot. at 15. As to Eoyang's refusal to return the plaintiff's duties, the defendant has made it clear that it was concerned about a supervisor who would not be present on site as a full-time employee. Def.'s Mot. Ex. 8 (stating that, "[s]imply put, to be an effective supervisor, you must be available to your subordinate employees on a regular, full-time basis. When you returned to work on February 2, 1998, you returned on a part-time basis . . ."). With regard to the plaintiff's commuting arrangement, as the defendant states, the declaration of Eoyang indicates that the plaintiff's work schedule was erratic after his return to work in February. "Moreover, even by January 1999, Plaintiff was continuing to insist on a non-existent right to set his own 'flexible' work schedule without any commitment to come into the office." Def.'s Mot. at 16 (citing Def.'s Statement ¶¶ 15-17); *see also* Opp'n Ex. 10 (memorandum from Eoyang to the plaintiff indicating that "supervisory concurrence and approval is a requirement" for any telecommuting arrangement and that the plaintiff had not sought that approval[9]). The court determines that the defendant has met its rebuttal burden,

---

[9] To the extent the plaintiff takes issue with any heightened scrutiny of his commuting arrangements, the plaintiff fails to state an adverse personnel action. *Cf. Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (holding that "hyper-scrutiny" of sick leave requests, even where other

which is merely one of production. *See Burdine*, 450 U.S. at 254-55. Thus, the court proceeds to the third stage of the *McDonnell Douglas* analysis. 411 U.S. at 802.

### 4. Pretext

At the outset, the court notes that it is "not free to second-guess an employer's business judgment," and that a plaintiff's mere speculations as to pretext are "insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988). That said, the plaintiff attempts to rebut the defendant's purported nondiscriminatory reasons as follows. First, the plaintiff claims that he was "always available to his staff and to his supervisors." Opp'n at 13. But the deposition to which the plaintiff refers the court's attention discusses the plaintiff's work in 1996 and indicates simply that the deponent could easily get in contact with the plaintiff by e-mail. Opp'n Ex. 13. Aside from falling short of the relevant time period by a few years, the plaintiff's evidence misses the point: as Eoyang indicated to the plaintiff, Eoyang would not return supervisory duties to someone who had not returned to full-time employment. Def.'s Mot. Ex. 8. Similarly, the plaintiff's argument (which lacks a pinpoint cite to the record) that he had good performance ratings has little impact on the defendant's concerns. In short, the fact the plaintiff was a good employee who checked his email frequently in 1996 does not present sufficient evidence from which a reasonable trier of fact could find in

---

employees were not required to provide written documentation for their absences, did not amount to an adverse action). *Hussain v. Principi*, 2004 WL 2430097, * 13 n.25 (D.D.C. Oct. 28, 2004) (noting that the "plaintiff was not in fact 'denied' medical leave, but failed to comply with Dr. Manning's request that he provide additional paperwork").

favor of the plaintiff for claims occurring several years later. *Reeves*, 530 U.S. at 142-44.[10]

Second, the plaintiff claims that his schedule did not become erratic until Eoyang "refused to allow Plaintiff to use FAA health facilities during the day, or threatened Plaintiff with [absent without leave ("AWOL")] status, or refused Plaintiff's requests for intermittent leave [] time for medical examinations." Opp'n at 13-14 (internal citations omitted). Again, the plaintiff's arguments are unavailing. As stated above, the plaintiff's complaint stems from the failure of Eoyang to reinstate the plaintiff's supervisory duties. But that "failure" occurred no later than February 1998, and the plaintiff has come forward with no evidence at all linking that event with any of the plaintiff's protected activities. Eoyang's threats of AWOL status reflected the fact that, as Eoyang put it, the plaintiff had been absent from work "throughout the entire pay period from October 26 to November 6 [1998]." Opp'n Ex. 31 (letter dated November 6, 1998, from Eoyang to the plaintiff). Moreover, Eoyang simply stated that failure to comply with proper leave procedures "may constitute" AWOL status. *Id.* The court cannot see how a reasonable trier of fact could find in favor of the plaintiff based on a supervisor's insistence on proper leave procedures. *Reeves*, 530 U.S. at 142-44.

Finally, the plaintiff cites the fact that an allegedly comparable employee, Loretta Flanders, was not treated in the same manner as the plaintiff. Opp'n at 14. The plaintiff also states that Eoyang himself had frequent absences from headquarters and has his own

---

[10] Nor does it help the plaintiff to quibble with his supervisor's judgment in deciding not to return the plaintiff's supervisory duties. *See* Pl.'s Statement ¶ 12 (stating that the plaintiff's "physical presence in the headquarters office to supervise his subordinates was not necessary since the majority of his staff in fact were on travel outside the Washington, D.C. metropolitan area or were subject to telecommuting agreements as well"). *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (warning against "judicial micromanagement of business practices") (citation omitted).

17

management difficulties. *Id.* Neither points helps the plaintiff. The plaintiff's evidence regarding Ms. Flanders simply states that she was another "grade 15" employee when Eoyang arrived at the FAA and does not cite to any facts regarding treatment of Ms. Flanders. Opp'n Ex. 15, at 18-19. And the fact that Eoyang was not a perfect supervisor in the plaintiff's eyes does not help the plaintiff defeat summary judgment. Accordingly, the plaintiff's comments regarding the treatment of Ms. Flanders in 1996 and Eoyang's alleged management difficulties do not present sufficient evidence from which a reasonable trier of fact could find in favor of the plaintiff. *Reeves*, 530 U.S. at 142-44. The court thus grants summary judgement to the defendant on the plaintiff's retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons the court grants the defendant's motion for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued on this 3rd day of January, 2005.

                                        RICARDO M. URBINA
                                        United States District Judge